R. P. Farnsworth & Co., Inc. v. Commissioner.
R. P. Farnsworth & Co. v. Commissioner
Docket No. 8826.
United States Tax Court
1947 Tax Ct. Memo LEXIS 281; 6 T.C.M. (CCH) 244; T.C.M. (RIA) 47061; March 5, 1947
Thomas A. Williams, Esq., 1028 Whitney Bldg., New Orleans 15, La., for the petitioner. J. Marvin Kelley, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: Respondent determined deficiencies in petitioner's income, declared value excess profits and excess profits tax liabilities for the calendar year 1941 in the following respective amounts, $6,073.76, $2,930.40 and $21,876.85, or a total of $30,881.01. The question is whether respondent properly disallowed as excessive certain amounts paid by petitioner to seven of its executive officers for services rendered during the calendar year 1941. Petitioner filed its return with the collector of internal revenue for the district of Louisiana at New Orleans on a calendar year and accrual basis. *282 Findings of Fact Petitioner, a Delaware corporation, was organized in 1935 with its principal office and place of business at New Orleans, Louisiana. Petitioner is engaged in the business of general contracting and the construction, which business as a partnership was originally founded in 1887 by R. P. Farnsworth, now deceased. The following schedule indicates the names and capacity of the seven executives, whose compensation is questioned. Also is shown their stockholdings in 1941 and their salaries for 1940 and 1941 and in so far as is known for 1942. Shares
Name
Capacity
Common
Pfd.
O. J. Farnsworth
Pres., General Mgr., Di-
356
400
rector, Chairman of Bd.
George S. Farnsworth
Vice-Pres. and Director
356
180
Richard A. Farnsworth
Vice-Pres., Director, in
356
100
charge of Houston, Tex.
office
S. K. Manson
Sec.-Treas. and Director
234
L. K. Good
Asst. to Pres. & Director
234
D. N. Chambers
Gen. Supt. & Director
234
H. Pratt Farnsworth
Gen. Supt.
103
1,873
680
Salary
Name
Capacity
1940
1941
1942
O. J. Farnsworth
Pres., General Mgr., Di-
$21,000
$30,000
$45,000
rector, Chairman of Bd.
George S. Farnsworth
Vice-Pres. and Director
$20,000
$29,000
$42,000
Richard A. Farnsworth
Vice-Pres., Director, in
20,000
29,000
42,000
charge of Houston, Tex.
office
S. K. Manson
Sec.-Treas. and Director
12,000
21,000
30,000
L. K. Good
Asst. to Pres. & Director
12,500
21,750
*
D. N. Chambers
Gen. Supt. & Director
12,500
21,750
*
H. Pratt Farnsworth
Gen. Supt.
10,000
12,900
**
$108,000
$165,400
$159,000
*283 O. J. Farnsworth, hereinafter referred to as O. J., has been in the contracting business since he was 19 years old. He became president of the business when his father died. As president, general manager and chairman of the board of directors, he guides the general policy of petitioner and coordinates the efforts of the other officers. He consults with the other executives on general problems, makes estimates and visits projects under construction. He is also in charge of obtaining credit for petitioner from banks. During 1941, in addition to these duties, he supervised the erection of two buildings for the Baptist Hospital in New Orleans. George S. Farnsworth, hereinafter referred to as George, studied civil engineering for two years at Tulane University. He began his career in construction as apprentice bricklayer. Thereafter, he worked variously as carpenter, concrete foremen, excavating foreman, carpenter foreman, masonry foreman, and superintendent. During 1941 George priced jobs, estimated, prepared and made bids, supervised and did general contracting for petitioner. During 1941 George was superintendent of the Magnolia Housing project and was assisted *284 in this work by H. Pratt Farnsworth and Richard A. Farnsworth. George also supervised, during 1941, the construction of the Naval Air Base at New Orleans and worked with and assisted Chambers, who was general superintendent of the Jackson Barracks project at New Orleans. George further supervised in this year the construction of a defense housing project at Biloxi, Mississippi. Richard A. Farnsworth, hereinafter referred to as Richard, had two years of college training at Washington University and one year at Tulane where he studied architecture. In 1921 he went to work for petitioner's predecessor as a bricklayer, later becoming superintendent of construction. During 1941 Richard, as petitioner's vice president and director, was in charge of the Houston office, made trips to Washington, D.C. to obtain Government contracts, assisted pricing jobs, visited projects under construction, advised with superintendents and consulted on machinery purchases. Richard was also in charge of accounting in the field. He was active in petitioner's personnel problems and public relations. Richard, in 1941, assisted Chambers on the Jackson Barracks project and was co-superintendent with him on the *285 Lafitte Housing project. S. K. Manson started working with petitioner's predecessor in 1923 as bookkeeper. During 1941 Manson had an assistant bookkeeper under him and two secretaries who worked exclusively on Social Security taxes. As secretary and treasurer, which he became in 1927, he had general supervision of the home office and the accounting policies of the entire company. Manson arranged surety bonds, handled tax and insurance problems and acted as petitioner's credit manager. He also qualified petitioner to do business in other states. He was a brother-in-law of the Farnsworths. Louis K. Good had graduated from the School of Engineering at Tulane and was a licensed engineer. He began working with petitioner's predecessor in 1929. Good concentrated considerable of his efforts on estimating and expediting for petitioner. He also handled a large portion of petitioner's correspondence with subcontractors and closed out with subcontractors under O.J.'s supervision. Good did most of petitioner's buying which was particularly difficult in 1941 due to tight markets. He became a stockholder and director in 1937. Dunbar N. Chambers spent one year at Louisiana State University *286 studying engineering. He started work with petitioner's predecessor in 1925 as timekeeper. He later became brick superintendent and general labor foreman. He was particularly experienced in steel reinforcing, concrete pouring, excavating, and pile driving. He became a stockholder and director and general superintendent of petitioner in 1937. During 1941 Chambers was co-superintendent with Richard on the Lafitte project. He also supervised the construction of the Jackson Barracks and was in charge of the defense housing project on Moss Street in New Orleans. H. Pratt Farnsworth, hereinafter referred to as Pratt, worked with petitioner's predecessor from 1907 to 1926. From 1926 to 1937 he was in the contracting business for himself. Since 1937 he has worked for petitioner. In 1941 he was general superintendent and was in charge of the masonry work in connection with the Lafitte project. During 1941 he was also superintendent of the Tulane Library and Louisiana Shipyards jobs. During 1940 petitioner completed the following construction projects: Housing Authority of New Orleans, Magnolia Housing Project, Louisiana State Board of Education Student Center, Section #1 and Section #2, *287 State College, Louisiana
Baptist Hospital #1, New Orleans, Louisiana
Baptist Hospital #2, New Orleans, Louisiana
N. L. Hawkins - Warehouse, New Orleans, Louisiana
Southern Bell Telephone and Telegraph Co., New Orleans, Louisiana
Eberhard Deutsch, New Orleans, Louisiana
The total of these contracts was $2,985,661.47, on which petitioner realized a gross profit of $271,218.28. On December 31, 1940, petitioner had the following projects in progress: Board of Administrators of Tulane Educational Fund - Tulane University Library, New Orleans, Louisiana
Housing Authority of New Orleans, Lafitte Housing Project, New Orleans, Louisiana
First National Bank of Jefferson, Jefferson Parish, Louisiana
Baptist Hospital, New Orleans, Louisiana. The total contract prices of these projects was $3,450,682.40 on which $1,738,127.26 had been paid. During 1941 petitioner completed the following projects: Housing Authority of New Orleans, Lafitte Housing Project, New Orleans, Louisiana
United States Government, Naval Reserve Air Base, New Orleans, Louisiana
Louisiana Shipyards, Inc., New Orleans, Louisiana, Contract No. 7 Louisiana Shipyards, Inc., New Orleans, Louisiana, *288 Contract No. 8 Board of Administrators of Tulane Educational Fund, Tulane University Library, New Orleans, Louisiana
United States Government, Jackson Barracks, New Orleans, Louisiana
Baptist Hospital, Lawton Home, New Orleans, Louisiana
Baptist Hospital, Addition to Educational Bldg., New Orleans, Louisiana
First National Bank of Jefferson, Jefferson Parish, Louisiana
Flintkote Company, New Orleans, Louisiana
Housing Authority of New Orleans, Magnolia Housing Project, Extra contract, New Orleans, Louisiana
These contracts were in the total amount of $5,742,614.54 on which petitioner realized a gross profit of $448,779.72. On December 31, 1941, petitioner had the following projects in progress: United States Housing Authority, Defense Housing, Moss Street Project, New Orleans, Louisiana
United States Housing Authority, Defense Housing, Biloxi Project, Biloxi, Mississippi
Todd Johnson Dry Docks, Inc., New Orleans, Louisiana
Kentucky Street Warehouse Additions, New Orleans, Louisiana
Nashville Avenue House, New Orleans, Louisiana
Vories Baking Company, New Orleans, Louisiana. The total contract price of the first two projects listed above was $1,669,434.57. *289 The remaining projects were on a cost-plus basis. At the close of 1941 $985,207.60 had been paid on account of these contracts. During 1942 petitioner completed the following contracts: U.S.A. Staging Area Job, New Orleans, Louisiana Miscellaneous Cost, Rentals and Fees on U.S.A. Staging Area Job Naval Reserve Air Base Job, New Orleans, Louisiana. Miscellaneous Rentals and Fees on Naval Reserve Air Base Job U.S.A. Algiers Naval Job, Algiers, Louisiana
U.S.A. Housing Authority, Moss Street Defense Housing Job, New Orleans, Louisiana
Housing Authority Biloxi Defense Housing Job, Biloxi, Mississippi
U.S.A. Jackson Barracks Job #2, New Orleans, Louisiana
U.S.A. Jackson Barracks Job #3, New Orleans, Louisiana
U.S.A. Army Air Base Job, New Orleans, Louisiana
U.S.A. Naval Storage Warehouses, Algiers, Louisiana
Todd Johnson Dry Dock Job #1, New Orleans, Louisiana
Todd Johnson Dry Dock Job #2, New Orleans, Louisiana
Baptist Hospital Job, New Orleans, Louisiana (42-1) Baptist Hospital Job, New Orleans, Louisiana (41-2) U.S.A. Recreation Building, Chalmette, Louisiana
U.S.A. Harding Field W.A.A.C. Job, Baton Rouge, Louisiana
W. Horace Williams Co. Job, U.S. *290 Marine Barracks, Bell Chasse, Louisiana
U.S.A. Army Air Base L 9 Job #1, New Orleans, Louisiana
U.S.A. Civilian Mess Hall Job, New Orleans, Louisiana
U.S.A. General Depot Job, New Orleans, Louisiana
Algiers Pump Station Job, Algiers, Louisiana
Voories Baking Company Job, New Orleans, Louisiana
St. Charles Ave. Baptist Church Job, New Orleans, Louisiana
Young Men's Christian Association Job, New Orleans, Louisiana
Napoleon Ave. Presbyterian Job, New Orleans, Louisiana
Maintenance of Jobs Completed in Prior Years The total amount of these contracts was $13,233,209.06, on which petitioner realized a gross profit of $946,029.41. On December 31, 1942, petitioner had the following projects in progress: United States Army Air Base, L 9, Job #2, New Orleans, Louisiana
U.S.A. Centreville Project Job, Centreville, Louisiana
U.S.A. Harding Field Job #2, Baton Rouge, Louisiana
U.S. Naval Hospital Job, New Orleans, Louisiana
U.S.A. Pilot Town Job, Pilot Town, Louisiana
U.S.A. Hutments Job, New Orleans, Louisiana
U.S.A. Camp Shelby Job, Shelby, Louisiana
Five of these contracts totalled $7,414,653.87. Two were on a cost-plus basis. At the close of 1942, $6,033,741.17 *291 had been paid petitioner on account of these contracts. During 1943 petitioner completed the following projects: General Housing Buildings, Centreville Cantonment, Centreville, Mississippi
Hutments and Appurtenant Facilities, New Orleans Air Field Housing Facilities for WAACs at Staging Area, New Orleans, La. Addition to hospital facilities, Staging Area, Harahan, La.
Additional hospital housing facilities, Camp Shelby, Miss. Additions to station hospital, Camp Polk, Louisiana
Facilities for a 2,000 bed general hospital, Tuscaloosa, Ala.
Hospital building, for tank destroyer center, Camp Hood near Gatesville, Texas. U.S.A. Bomber Air Base Harding Field #2 Camp Pontchartrain Recreation Center WAAC housing, Lake Charles, Louisiana
New Orleans Salvage & Reclamation Center Camp Ponchartrain Mess Hall and Shed Job United States Navy, cost plus fixed fee contract #4501 Railway Express Agency
Railway Express Company, Dryades Street Otis Astoria Company
Tulane Gymnasium Touro Synagogue St. Charles Ave. Baptist Church Vories Baking Company The total amount of these contracts was $16,109,619.49 on which petitioner realized a gross profit of $2,697,722.29. *292 On December 31, 1943, petitioner had the following projects in progress: Napoleon Ave. Presbyterian Church Algiers Naval Station, Brigade Guard House Algiers warehouses Algiers B/B barracks Algiers Naval Station, Brigade Guard House #2 Southern Baptist Hospital U.S.A. Gulfport project Higgins housing project #1 Higgins housing project #2 Higgins sewer job National Housing Agency, Pascagoula, Miss.
Lagarde Hospital Gymnasium Additional housing facilities, Orange, Texas
Orange, Texas, water tank Orange, Texas, housing facilities Port Arthur, Texas, job Natatorium, N.O.Y. - 6242 U.S. Naval Air Base, New Orleans, B/B barracks Administration and Waves Barracks Tuscaloosa General Hospital #2 Assembly and repair shop, including taxiways Orange, Texas, infirmary cafeteria Orange, Texas, store building Orange, Texas, commercial job At the close of 1943 the cost to petitioner on the work performed on these contracts was $3,337,369.31. Petitioner had been paid on account of such contracts $2,959,702.61. In addition to the contracts awarded to it, petitioner bid on numerous projects on a competitive basis. During 1940 petitioner bid on but was *293 not awarded 20 contracts. The total aggregate amount bid by petitioner on these contracts was $7,161,067. During 1941 petitioner bid on but was not awarded 47 contracts. Petitioner's total aggregate bid on these contracts was $24,185,530.98. For the years 1935 through 1943, inclusive, the ratio of petitioner's current assets to current liabilities was as follows: 1935
2.51 to 1
1936
5.53 to 1
1937
1.55 to 1
1938
3.67 to 1
1939
2.48 to 1
1940
3.12 to 1
1941
3.45 to 1
1942
3.46 to 1
1943
1.34 to 1
On its income tax returns for 1940, 1941 and 1942 petitioner reported gross income in the respective amounts of $272,575.87, $454,993.78, and $949,910.40. For these same years petitioner reported as net income for declared value excess profits tax computation, being gross income less deductions, the following respective amounts: $140,144.52, $194,366.70 and $595,083.74. From 1935 to 1943, inclusive, petitioner declared the following amounts in dividends on its common stock: 1935
No dividends
1936
$23,000
Paid in stock
1937
69,000
Paid by notes
1938
25,000
Paid by notes
1939
35,000
Paid by notes
1940
336.73
Paid in cash 87,300
Paid in stock
1941
No dividends
1942
77,920
Paid in cash 1943
93,650
Paid in cash *294 In 1940, 680 shares of 6 per cent debenture or preferred stock at a par of $100 each were issued. During 1941, $4,080 was paid on account of this stock to holders thereof, who have been indicated above. In 1942 there was issued 970 more shares of this debenture or preferred stock and in 1943 there was issued an additional 680 shares. The holders of the shares issued in 1942 and 1943 do not appear. At the end of 1941 a directors' meeting was held to discuss the question of dividends. George, Richard and Chambers were in favor of dividends being declared. O.J. and Manson were opposed to the declaration of dividends. The other directors finally acceded to the views of O.J. and Manson and no dividends were declared. The reasons for not declaring dividends in 1941 were that the war in Europe and the very recent outbreak of war in the Pacific indicated a tremendous increase in petitioner's business for 1942 and the resulting need for working capital. Furthermore, the company which bonded petitioner's construction contracts advised petitioner against declaring dividends in 1941. The bonding company considered it advisable in view of the anticipated increase in construction work in 1942 *295 for petitioner to keep its surplus capital intact. All seven of the executives except Pratt customarily signed bonds in large amounts in connection with petitioner's construction contracts and thereby incurred not only a liability against petitioner but also incurred personal liability. When the salary increases of these executives were voted on July 15, 1941, no consideration was given to the possible payment or non-payment of dividends. It was not then known whether dividends would be paid at the end of the year. Petitioner had an enviable reputation as a skillful and reliable contractor of long standing. The seven executives here involved were highly regarded for their ability in the construction field. These men worked together as a highly integrated, coordinated team. The individual and combined efforts of these men accounted in a large measure for petitioner's earning capacity. A large proportion of petitioner's business was obtained as a result of competitive bidding which requires great skill and experience. Under competitive bidding, errors of judgment are costly and the hazards are many. Petitioner resorted to the use of subcontractors to a less degree than most general *296 contractors did. Because of the character and variety of the talent it possessed petitioner was able to perform many types of special work ordinarily requiring the services of a subcontractor. The minor use of subcontractors resulted in greater profits to petitioner but imposed upon its personnel greater burdens and risks. During 1941 the demand for engineers and construction personnel was very great. The prices for such talent had greatly increased. Engineering and construction firms were attempting to lure talent from each other by promising higher compensation. This proselyting made it not only difficult to obtain the requisite personnel but also made it more difficult to hold personnel once obtained. Of the $165,400 claimed by petitioner as a deduction for compensation paid to the seven executives here involved for services rendered during 1941 respondent disallowed $44,400. Respondent disallowed as excessive the amount of $7,000 of each of the salaries of O. J., George, Richard and Manson. Respondent similarly disallowed $7,250 of each of the salaries of Good and Chambers, and also disallowed $1,900 of Pratt's salary. The salaries paid by petitioner to each of the seven *297 executives concerned for services rendered during 1941 was reasonable in amount. Opinion Respondent argues that the salaries in question are partially excessive in amount relying primarily on the fact that the executives involved were stockholders and that no dividends were paid during the year. Petitioner, on the basis of the voluminous and convincing evidence, argues that the salaries in question were reasonable in amount. After having carefully weighed and considered all the facts and circumstances of this case we are of the opinion that petitioner has sustained its burden of proving the compensation in question as reasonable in amount. Respondent's argument relies primarily on the fact that the officers in question were stockholders and that no dividends were paid during the taxable year. It is unquestionably true that stock ownership and the absence of dividends are factors of considerable significance in determining the reasonableness of compensation. Under certain circumstances these facts tend to indicate that the compensation in question was in reality a disguised distribution of profits. The facts and circumstances of the instant case, however, in our opinion, do not *298 lend such a connotation to the facts of stock ownership and the absence of dividends. We are satisfied that there were valid and justifiable business reasons for not declaring dividends at the close of 1941. At the close of 1941 this country was engaged in a war in Europe. The Japanese attacked on December 7, 1941. These events were sufficient to persuade a conservative business mind that the future was fraught with radical change and uncertainty. At the close of 1941 petitioner realized that the volume of its business would be tremendously increased in the coming year which would require large amounts of capital. Furthermore, petitioner's bonding company advised against declaring dividends at that time. These facts and considerations strike us as being adequate reason for postponing a dividend declaration without resort to the inference of disguised distribution of profits. It is also of significance, we think, that the failure to declare a dividend was an isolated fact confined to one year. Petitioner's dividend record over the 9-year period from 1935 to 1943, inclusive, indicates a fair return on capital investment. Nor was the failure to declare dividends in 1941 due to the *299 fact that the increased compensation granted in that year depleted earnings to such an extent as to make a dividend declaration impossible. Even after the payment of the increased compensation there were ample earnings available for dividends which, for what we consider valid business reasons, were left in the business as a surplus working fund. Furthermore, it should be noted that the salaries for 1941 were determined in July at which time the earnings for the year were not known nor considering the uncertainty and hazards of the contracting business could they have been then readily ascertained. When the salaries were authorized it was not known whether dividends would or would not be paid at the end of the year. On the more positive side we think petitioner has introduced abundant evidence indicating not only that the amounts paid were for services rendered but that such amounts were also reasonable in amount considering all the attendant circumstances. Some of the factors usually considered in determining the reasonableness of compensation are the ratio of compensation to gross income, the size of the business, the extent and scope of the employee's work, the employee's qualification *300 and contribution to the business, general economic conditions, the availability of others to fill the job, the time of the year the compensation is determined and comparisons to the compensation being paid by others to similar employees in comparable businesses. A careful analysis and consideration of all these factors as applied to the instant case tends to support petitioner's claim of reasonableness. The ratio of the compensation involved to petitioner's gross income is not unbalanced. The volume of petitioner's business and its earnings in 1941 were very substantial and considerably increased over the prior year. This increased business involved a corresponding increase in the efforts of the seven executives in question because petitioner's business depended very directly on the skill and energy of these officers. In this respect the instant case is different from those wherein an increased volume of business does not necessarily involve an increase in the efforts of the executives concerned. We think the record clearly establishes that the seven executives here involved were men of great ability and energy. Petitioner's success depended almost solely on the reputation, skill *301 and industry of these men. During the taxable year the type of talents these men possessed were in great demand. Competing contracting firms were raiding each other for such talent and its cost consequently rose sharply. Petitioner introduced two witnesses, George Rice and Alvin M. Fromherz. These witnesses were intimately acquainted with the contracting business and with petitioner and its executives. The testimony of these two witnesses demonstrates to our satisfaction that the compensation paid by petitioner to its executives was not out of line with the compensation being paid by other contractors to men with similar responsibilities. For these reasons and after having carefully considered all the facts and circumstances of the case, we hold that the compensation paid by petitioner to its seven executives for services rendered during 1941 was reasonable in amount and is, therefore, deductible in full as a business expense under section 23(a). Internal Revenue Code. Decision will be entered for petitioner. Footnotes
*. Not indicated.↩